**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MACKENZIE BROWN, a single woman,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>STATE OF ARIZONA; ARIZONA BOARD OF REGENTS, DBA University of Arizona, a constitutionally created body corporate,<br>*Defendants-Appellees*,<br><br>and<br><br>RICHARD A. RODRIQUEZ; RITA RODRIQUEZ,<br>*Defendants*,<br><br>v.<br><br>LIDA DEGROOTE,<br>*Third-Party-Plaintiff.* | No. 20-15568<br><br>D.C. No.<br>2:17-cv-03536-GMS<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, Chief District Judge, Presiding

Argued and Submitted February 4, 2021
Phoenix, Arizona

Filed January 25, 2022

Before: William A. Fletcher, Eric D. Miller, and
Danielle J. Forrest,[*] Circuit Judges.

Opinion by Judge Forrest;
Dissent by Judge W. Fletcher

---

## SUMMARY[**]

---

### Title IX

The panel affirmed the district court's summary judgment in favor of the University of Arizona in a Title IX action brought by Mackenzie Brown, who suffered physical abuse at the hands of her former boyfriend and fellow University student at his off-campus residence.

The panel held that, under *Davis ex. rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), Title IX liability exists for student-on-student harassment when an

---

[*] Formerly known as Danielle J. Hunsaker.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

educational institution exercises substantial control over both the harasser and the context in which the known harassment occurs. The panel unanimously held that the control-over-context requirement was not met based on Brown's theory that the university had substantial control over the context of Brown's former boyfriend's abuse of other victims and failed to take proper action, and the majority rejected the dissent's theory that the boyfriend, a university football player, had to have university approval to live off campus and his housing was paid for with scholarship funds that he received from the university.

Dissenting, Judge W. Fletcher wrote that, while the physical location of the harassment can be an important indicator of a school's control over the "context" of alleged harassment, the key consideration is whether the school had disciplinary authority over the harasser in the setting in which the harassment took place. Judge W. Fletcher wrote that an off-campus residence paid with scholarship funds that Brown's former boyfriend received from the university, and where students reside with permission of the school, is such a setting. Accordingly, the university had control over the "context" in which Brown was assaulted.

**COUNSEL**

Isabel M. Humphrey (argued), Hunter Humphrey & Yavitz PLC, Phoenix, Arizona, for Plaintiff-Appellant.

Claudia Acosta Collings (argued), Assistant Attorney General; Mark Brnovich, Attorney General; Office of the Attorney General, Tucson, Arizona; Stephanie Elliott, Assistant Attorney General, Office of the Attorney General Phoenix, Arizona; for Defendants-Appellees.

**OPINION**

FORREST, Circuit Judge:

The Supreme Court has held that Title IX liability exists for student-on-student harassment where an educational institution "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). The question here is whether the second control-over-context requirement is met where Plaintiff Mackenzie Brown seeks to hold the University of Arizona (University) liable for physical abuse that she suffered at the hands of her former boyfriend and fellow University student at his off-campus residence. Brown asserts that the control-over-context requirement is met because the University had substantial control over the context of her former boyfriend's abuse of other victims and failed to take proper action, even though it did not have control over the context of her abuse. Our dissenting colleague alternatively asserts that *Davis*'s control-over-context requirement is met because the boyfriend, a University football player, had to have University approval to live off campus and his housing was paid for with scholarship funds that he received from the University. We reject both propositions and affirm the district court's grant of summary judgment in favor of the University.

## I.  BACKGROUND

### A.  Factual Background

Mackenzie Brown was physically assaulted by her boyfriend, Orlando Bradford, while they were both undergraduates at the University. Bradford, a university football player, physically assaulted two other female

students—Student A and Lida DeGroote—before assaulting Brown. Brown sued the University,[1] alleging that it violated Title IX by failing to respond to reports of Bradford's prior domestic abuse, giving Bradford an opportunity to abuse Brown. Because Brown's Title IX claim is based on the University's failure to respond appropriately to reports that Bradford physically abused Student A and DeGroote, those facts are outlined below.

### 1. Initial concerns arise about domestic violence against Student A.

Bradford started dating Student A, a university softball player, in fall 2015. Late one night in September 2015, students informed a dormitory Resident Assistant (RA) that they saw Student A and Bradford in a physical altercation in a study room. When confronted by the RA, Bradford said that he and Student A were just joking. The RA reported the incident to the on-call Community Director and was told not to call police. The RA created an electronic report of the incident noting that he "felt like this might have started off as a very serious physical and verbal altercation[.]"

Just before Thanksgiving, one of Student A's teammates escorted her to Bradford's dorm room to collect some of Student A's belongings. Bradford refused to let Student A get her things and screamed at her. Student A later admitted to her teammate that Bradford had pushed her up against a wall and choked her. When the teammate returned on another occasion to get Student A's belongings, Bradford

---

[1] For simplicity, this opinion refers to all defendants collectively as the "University."

admitted to hitting Student A. The teammate did not report this information until several months later.

During winter break, Student A told her family that she broke up with Bradford. In January 2016, Student A's mother called softball coach John Candrea to discuss concerns about Student A's relationship and breakup with Bradford, describing it as "not a good situation." Candrea relayed the conversation to Erika Barnes, the Senior Associate Athletics Director and Deputy Title IX Coordinator. Barnes arranged for Student A to see a school psychologist.

### 2. University officials learn of potential abuse against Student A and DeGroote.

In March 2016, Student A attended a team study hall with a black eye that she claimed was caused by a door. Another player also noticed fingerprints on her neck. Concerned for Student A's safety, two teammates told Candrea about Student A's black eye and what occurred during the previously described trips to Bradford's dorm room. The next day, Candrea sent the two teammates to speak with Barnes. They told Barnes about Bradford's earlier behavior towards Student A and Student A's black eye and bruises. The two teammates also told Barnes that Bradford was dating and possibly abusing another student—DeGroote.

Shortly after that meeting, Barnes met with Student A. Barnes asked if Bradford had given her a black eye, which Student A denied. Barnes encouraged Student A to visit the Office of the Dean of Students to learn about available university resources, including the procedure for filing a complaint against Bradford. Student A agreed, and Barnes accompanied her to meet with Susan Wilson, a Senior Title

IX Investigator in the Office of the Dean of Students. Although Wilson gave Student A information about filing a complaint and other resources, Student A said she was no longer seeing Bradford and was not concerned about him. Wilson asked whether she had concerns during the relationship, and Student A disclosed that Bradford had put his hands on her neck once. Student A also mentioned that she believed Bradford was living or staying with someone named "Lida."

Wilson told Christina Lieberman, a university administrator, about the conversation with Student A and the mention of DeGroote. Lieberman had an upcoming meeting for an unrelated issue with DeGroote, and Wilson relayed that DeGroote might be in a concerning relationship. Although Wilson suggested that Lieberman raise the issue with DeGroote, Lieberman declined, stating she would encourage DeGroote to share information about Bradford on her own. But DeGroote did not offer any information about Bradford during the meeting, and Lieberman did not ask her about the relationship.

In early April 2016, Bradford went to Student A's dorm room late at night while intoxicated and knocked on the door and yelled for several hours. Candrea told Barnes about the incident, and Barnes called Student A. Barnes also arranged a meeting in her office with Student A and the University of Arizona Police Department. According to the police report, Student A recounted the event the night before and stated that she and Bradford had "several physical fights" and that Bradford choked her three or four different times. Student A asked about obtaining a protection order. No criminal charges resulted from this investigation.

After the meeting with Student A and the university police, Barnes contacted Athletic Director Greg Byrne and

told him about the late-night dorm room incident. She did not mention the physical abuse Student A described. The head football coach, Richard Rodriguez, was away, so Byrne and assistant coach Calvin Magee met with Bradford. They told Bradford that underage drinking violated the team rules and punished him for the violation. Magee did not know that allegations of violence were made against Bradford.

Later in April 2016, the University issued a no-contact order against Bradford for Student A. Because of the no-contact order, Bradford was removed from his dorm room and reassigned to a different room. Ultimately, Bradford moved off campus with another football player.

The following month in May 2016, DeGroote's mother told Lieberman during a phone call that she was concerned for DeGroote's safety and referenced bruises on her arm. Lieberman was silent in response.

### 3. Bradford assaults Brown.

Bradford started dating Brown in February 2016. He became abusive toward her several months later in the summer of 2016. Between June and mid-September, Brown alleges that there were five to ten instances where Bradford physically abused her. She primarily focuses on a two-day period in September 2016.

On September 12, Brown went to Bradford's off-campus house after she got off work. She and Bradford got into an argument, and Bradford physically assaulted her multiple times by pushing her, pulling her hair, and hitting her. The next day, they again got into an argument at Bradford's house, and Bradford physically assaulted Brown multiple times. Brown suffered significant injuries.

On September 14, Brown told her mother what had happened, and her mother reported the abuse to police. Bradford was arrested.[2] The next day, DeGroote's mother made an anonymous report to police that Bradford had also abused her daughter.

The University placed Bradford on an interim suspension after his arrest. Immediately upon learning of Bradford's arrest, Rodriguez also removed him from the football team. Until the arrest, Rodriguez did not know about Bradford's violent behavior. Rodriguez knew only of the April 2016 dorm-room incident where Bradford was "drunk and banging on a door." Rodriguez maintains that, had he known of the earlier abuse, he would have dismissed Bradford because he has a zero-tolerance policy for violence against women. Bradford was expelled from the University a month after his arrest.

## B.  Procedural History

Brown sued the University alleging, among other things, that it violated Title IX by failing to appropriately respond to reports that Bradford physically abused Student A and DeGroote.[3] The University moved for summary judgment, and the district court entered judgment in favor of the University because, although it was "undeniable that [the University] exercised substantial control over Bradford," Brown "ha[d] not offered any evidence that [the University]

---

[2] The parties represent that Bradford was convicted of felony aggravated assault and domestic violence and was sentenced to five years' imprisonment.

[3] DeGroote sued separately, and her case was settled. *See DeGroote v. Ariz. Bd. of Regents*, No. 2:18-cv-0310-SRB (D. Ariz. 2018).

exercised control over the context in which *her* abuse occurred." Brown timely appealed.

## II.  DISCUSSION

We review the district court's grant of summary judgment de novo. *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the University is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c).

## A.  Title IX Liability

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action under Title IX to seek monetary damages. *Davis*, 526 U.S. at 639. However, the Court has also made clear that an educational institution that receives federal funds "may be liable in damages under Title IX only for its own misconduct." *Id.* at 640. Title IX does not create respondeat superior liability. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). Where an educational institution does not directly violate Title IX through an official policy or other direct action, the institution is liable in damages for another actor's discriminatory conduct only if it exercises control over that actor and an institution official with authority to take corrective action has actual knowledge of the misconduct and responds with deliberate indifference. *Id.* at 290; *Davis*, 526 U.S. at 642–44.

In *Gebser*, the Supreme Court applied this principle to teacher-on-student misconduct and held that the school district was not liable for a teacher's sexual abuse of a student about which it had no knowledge. 524 U.S. at 291. There was no need for the Supreme Court to address the school district's control over the teacher or the context in which the abuse occurred because these requirements were clearly met. The key issue was whether the school district engaged in misconduct by failing to properly respond to known abuse. *See id.*

In *Davis*, the Supreme Court addressed student-on-student misconduct and provided guidance about the control an educational institution must exercise for liability to arise in this context. 526 U.S. at 643–45. Title IX has a targeted objective: It prohibits discrimination that occurs "under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Education "program or activity" is defined as "the operations of" an educational institution subject to Title IX. *Id.* § 1687. The Court explained that this text "cabins the range of misconduct that the statute proscribes . . . based on the [institution]'s degree of control over the harasser *and* the environment in which the harassment occurs." *Davis*, 526 U.S. at 644 (emphasis added). That is, because the statute only addresses misconduct that occurs "'under' 'the operations of' a funding recipient, the harassment must take place in a context subject to the school['s] . . . control." *Id.* at 645 (internal citation omitted).

This second element of control is required because an educational institution is not liable under Title IX for others' misconduct that it cannot remedy. *Id.* at 644. Deliberate indifference to discrimination—the institutional misconduct that must be proven if the institution is not itself engaging in

misconduct—can occur only if the educational institution can intervene or take some remedial action. *See id.* In other words, there can be no institutional liability unless the educational institution has notice and the ability to take corrective action, which is premised on "substantial control over *both* the harasser and the context in which the known harassment occurs." *Id.* at 645 (emphasis added).

To ensure that this direct-liability requirement is met, it is well established that a plaintiff alleging a Title IX claim arising from student-on-student harassment or assault must establish five elements:

(1) "[T]he school . . . exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]";

(2) "[T]he plaintiff . . . suffered harassment that is so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school";

(3) "[A] school official with authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf must have had 'actual knowledge' of the harassment";

(4) "[T]he school must have acted with 'deliberate indifference' to the harassment, such that the school's response to the harassment or lack thereof

[was] clearly unreasonable in light of the known circumstances"; and

(5) "[T]he school's deliberate indifference . . . subject[ed the plaintiff] to harassment."

*Karasek*, 956 F.3d at 1105 (internal quotation marks and citation omitted); *Davis*, 526 U.S. at 640, 644, 648, 650.

## B.  Brown's Theory

Applying this standard, the district court granted summary judgment to the University on the first element. The district court held that even though the University exercised substantial control over Bradford because he was a student athlete, the University did not have substantial control over the context or environment where *Brown's* assault occurred—Bradford's private, off-campus residence. Brown argues this was error because she does not have to show that the University controlled the context of *her* abuse, only that the University controlled the context in which it improperly failed to act, i.e., Bradford's assaults on Student A and DeGroote. Brown contends that the University's deliberate indifference towards Bradford's abuse of these earlier victims gave him an opportunity to abuse her. While Brown's anger with how the University handled the reports of Bradford's abuse of other students is understandable, her argument stretches the text of Title IX and the implied private action that the Supreme Court has recognized too far.

*Davis* requires that Brown prove the University controlled the context in which *her* abuse occurred—not just the context of Bradford's other assaults. 526 U.S. at 644–45. Where an educational institution has no control over the abuse the plaintiff suffered, such abuse does not occur

"'under' 'the operations of'" the institution. *Id.* at 645 (quoting 20 U.S.C. §§ 1681(a), 1687). And if this requirement is not met, *the institution* has not "expose[d] its students to harassment or cause[d] them to undergo [harassment] under the [institution]'s programs." *Id.* (internal quotation marks omitted).

Brown does not argue that the University controlled the off-campus environment in which she was assaulted. The extent of the University's involvement in Brown's abuse was allowing Bradford to remain a student after receiving reports that he was physically abusive to other women. Bradford abused Brown in a private, off-campus residence unconnected to any school activity. Even though the abuse may not have occurred absent Bradford and Brown's shared connection to the University, not everything that happens between fellow students occurs "under [the operations of]" the institution. 20 U.S.C. §§ 1681(a), 1687. It would be unreasonable to conclude that Title IX gives educational institutions adequate notice that accepting federal education funds imposes on them liability for what happens between students off campus, unconnected to any school event or activity. *See Davis*, 526 U.S. at 640.

Brown's effort to circumvent *Davis*'s control-over-context requirement by focusing on the University's knowledge of and failure to address Bradford's prior abusive behavior fails. She argues that her claim survives summary judgment because the University knew about Bradford's abuse of Student A and DeGroote and *these* attacks occurred in a context that the University controlled. In making this argument, she relies on the statement in *Davis* that "the school must exercise 'substantial control over both the harasser and context in which the *known* harassment occurs.'" *Id.* at 645 (emphasis added). In her view, the proper

focus of the control inquiry is "the context of the harassment that the university is being accused of failing to correct," not her abuse specifically. This argument misreads the precedent.

The Supreme Court used the phrase "known harassment" to reemphasize its earlier discussion limiting Title IX liability to situations where the University has actual knowledge of abuse. *Davis*, 526 U.S. at 645–46. The Court noted that it previously rejected a negligence standard, finding that it was insufficient to hold an educational institution "liable for its failure to react to teacher-student harassment of which it knew *or should have known*." *Id.* at 642 (citing *Gebser*, 524 U.S. at 283). Instead, the Court adopted a deliberate-indifference standard for harassment of which an educational institution has *actual* knowledge. *Id.*; *see also Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 621–22 (6th Cir. 2019) (holding a Title IX plaintiff cannot establish deliberate indifference based on harassment against other victims). The reference to "known harassment"—a call-back to the Court's rejection of a negligence standard—does not open the door to satisfying the control-over-context element by reference to events other than those involving the plaintiff.

## C. The Dissent's Theory

Our dissenting colleague also rejects Brown's theory as going too far, and instead argues that "the key consideration" in determining whether the educational institution controlled the context where misconduct occurred "is whether the school has disciplinary authority over the harasser in the setting in which the harassment takes place." That is, according to the dissent, where a school has disciplinary authority over the harasser, it necessarily has control over the context in which harassment occurs. Brown has not

advanced this theory, and in fact expressly disclaimed it, arguing that "[t]he question is whether the University had sufficient control over the context in which [Brown] alleges that it failed to act, not whether it had sufficient control over the context in which she was later attacked." Regardless, the dissent's reasoning conflates *Davis*'s two separate control requirements (control over the harasser and control over the context of the harassment) into one (control over the harasser). *See* 526 U.S. at 645.

There is no dispute that the University exercised substantial control over Bradford. But that is not enough. *Davis* set out two separate control elements that are related to two separate legal requirements. The control-over-harasser requirement arises from the limitation that educational institutions be held liable only for their own misconduct. *See id.* at 644. The control-over-context requirement arises from the limitation that Title IX addresses discrimination occurring only under an "education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). That a person subject to an educational institution's rules or authority engages in misconduct does not necessarily mean that his misconduct occurs *under* that institution's education program. Stated another way, not everything that a person subject to a school's disciplinary control does can be attributed to the school's operations. This is particularly true of student conduct.

The dissent focuses primarily on two facts in asserting that the University controlled Bradford's off-campus residence: (1) under the football team rules, Bradford had to have coach approval to live off campus; and (2) Bradford's University scholarship paid for his off-campus rent. The second fact is easily dismissed. That a student's off-campus housing is paid for with scholarship funds awarded by his

school does not make his residence part of the school's "operations." 20 U.S.C. §§ 1681(a), 1687. There is an appreciable difference between the degree of control an educational institution exercises over on-campus housing and off-campus housing, regardless of how it is paid for. And there is no indication in the record that by receiving University scholarship funds to cover his living expenses, Bradford's residence was deemed University property or that the University had regulatory control over his residence like it does over on-campus housing.

The University's ability to prevent Bradford from living off-campus is a closer question but still insufficient to establish that the University controlled Bradford's off-campus residence. The relevant football team rule provided: "Living off-campus is subject to approval by head coach and position coach. Off-campus subject to moving back on campus." The head football coach testified that players were allowed to live off-campus after their freshman year "as long as they were doing okay academically and, you know, not being irresponsible as far as making their appointments and practices and meetings and everything else on time."[4] Undoubtedly, this rule, among others, gave the University disciplinary authority *over Bradford*—the first control requirement—but it does not follow that it also gave the University control over Bradford's off-campus residence in the way that it controls its own property or the context of team or school activities regardless of where they occur. *See*

---

[4] The dissent asserts that the team rule permitted football players to live off-campus after their freshman year only "on condition of good behavior." The record, however, establishes only that this rule was intended to regulate players' academic performance and team obligations. The head coach also could not recall ever exercising his authority under this rule and requiring a player to move back on campus.

*Davis*, 526 U.S. at 646 (finding that a school "retains substantial control over the context in[] which the harassment occurs" when the abuse "takes place while the students are involved in school activities or otherwise under the supervision of school employees"). Disciplinary authority over a student is not enough by itself to establish that the school controls the locations or contexts where the student is found.

A couple examples further demonstrate the point. Imagine the student who grew up in Tucson and opted to live at home with his parents while attending the University and playing on the football team. He would be subject to the same player rule requiring permission to live off campus, but allowing him to live at home with his family does not mean that the University now controls the context of the family home. The University's control is limited to the student. And Title IX is not limited to higher education. So, also imagine a middle schooler who is subject to a student code of conduct that prohibits harassment of other students. She has a birthday party at her house over the weekend and violates the school's code of conduct. The school may have the authority to discipline her for her offending conduct that occurred outside of school hours and school activities, but that does not mean that the school controlled the context of her birthday party at her home sufficient to establish Title IX liability against the school. To be faithful to Title IX and *Davis*, there must be something beyond student-focused disciplinary authority that renders *the context* where the challenged harassment occurred part of the school's "operations." 526 U.S. at 645. To conclude otherwise eviscerates Congress's express requirement that conduct is actionable only if it occurs "under an[] education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The cases that the dissent cites in arguing that the University's control over Bradford is determinative of its control over his off-campus residence are inapposite because they all present circumstances where the institution had control over *the context* in which the harassment or abuse occurred separate from its control over the harasser. In *Doe v. University of Illinois*, which was decided before *Davis*, the plaintiff high-school student alleged she was subjected to "an ongoing campaign of verbal and physical sexual harassment perpetrated by a group of male students at the school." 138 F.3d 653, 655 (7th Cir. 1998). The Seventh Circuit held that she successfully stated a Title IX claim based on student-on-student harassment where the alleged harassment occurred "while the students are involved in school activities or otherwise under the supervision of school employees." *Id.* at 661. *Doe* does not explain how school employees supervised the "self-styled 'posse' of male students" who harassed the plaintiff, but it is clear from the opinion that the school had some control over the context of Doe's harassment because it occurred during the school day or under the school's supervision. *See id.* at 655.

In *Simpson v. University of Colorado Boulder*, the University football team brought prospective players to campus to recruit them. 500 F.3d 1172, 1180 (10th Cir. 2007). The coaching staff chose player-hosts for the recruits who "knew how to 'party' and how 'to show recruits a good time,'" and female students were chosen to serve as "Ambassadors" for the recruits. *Id.* at 1173, 1180. The player-hosts took the recruits to a female student's off-campus apartment where players and recruits sexually assaulted the plaintiffs. *Id.* at 1180. This was not simply a private, off-campus party. It was part of recruiting activities that the football coaching staff facilitated and encouraged to show recruits a "good time." Indeed, at least one recruit

knew that the purpose of going to the off-campus apartment was "to provide recruits another chance to have sex." *Id.* Similarly, in *Roe ex rel. Callahan v. Gustine Unified School District*, the plaintiff student was physically assaulted and harassed by fellow students at a school-sponsored football camp. 678 F. Supp. 2d 1008, 1012–14 (E.D. Cal. 2009). In these circumstances, the educational institutions had control over the context of the plaintiffs' abuse and harassment because it occurred during team or school activities.

Finally, in *Weckhorst v. Kansas State University,* the plaintiff got intoxicated at an off-campus fraternity event, and a fellow student who was a designated driver for a different fraternity sexually assaulted her in his vehicle and his off-campus fraternity house. 241 F. Supp. 3d 1154, 1159 (D. Kan. 2017). The district court concluded that the plaintiff sufficiently alleged that the University controlled the context in which her abuse occurred because, among other things, the University's website described fraternities "as 'Kansas State University Organizations'"; promoted fraternities; and had the authority to regulate fraternities, including fraternity parties. *Id.* at 1167.

Unlike these prior cases, this case has none of the indices that the University controlled the context where Brown was abused. Brown was not assaulted on school property or during a school-related activity, and she did not go to Brown's off-campus apartment for a school-related purpose. Nor did the University have regulatory control over Bradford's off-campus apartment like Kansas State University had over fraternities in *Weckhorst*. For example, the team rule that allowed coaching staff to force players to live on campus as a disciplinary tool did not give the coaches the right to enter or inspect the players' homes or otherwise control what occurred at the residence. Any control that the

University had related to Bradford's residence arose only from its control over *him*.

## III. CONCLUSION

Title IX's elements, as delineated by the Supreme Court, are not met where an educational institution controlled the context where abuse against other victims occurred but not where the plaintiff was abused. Likewise, a Title IX claim fails where the educational institution has substantial control over the harasser but no control over the context where the harassment occurred. We do not dispute that control over the harasser is a key component of a Title IX claim, but it is not sufficient. Conflating the control-over-context requirement into the control-over-harasser requirement expands Title IX's implied private right of action beyond what Title IX can bear.[5]

**AFFIRMED.**

W. FLETCHER, Circuit Judge, dissenting:

University of Arizona football player Orlando Bradford repeatedly assaulted fellow student Mackenzie Brown over the course of several months in the summer and early fall of 2016. Bradford's last assaults were extremely violent. They took place on two successive nights in September, during Bradford's sophomore year, in an off-campus house where Bradford was living with other university football players.

---

[5] Because we conclude that Brown failed to establish the University "exercise[d] substantial control over . . . the context in which the known harassment occur[red]," *Davis*, 526 U.S. at 645, we need not address her additional arguments on appeal.

Bradford's athletic scholarship paid his living expenses. Bradford and the other football players were living in the off-campus house only because the coaches of the university football team had given them permission to do so. Bradford's and the other players' permission to live off campus was conditioned on good behavior.

At the time of Bradford's assaults on Brown, university officials, including Title IX administrators, had knowledge of repeated prior violent assaults by Bradford on two other female undergraduates during his freshman year. Despite their knowledge, those officials did not take steps to ensure that Bradford would not be a danger to Brown and other students. Undisputed evidence in the record shows that if those officials had informed Bradford's coaches of his assaults on the other students, Bradford would have been immediately thrown off the football team, would have lost his athletic scholarship, and would have been expelled from the University by the end of his freshman year, months before his assaults on Brown.

Brown sued the University under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, contending that an appropriate response to Bradford's repeated assaults on the two other female students would have prevented Bradford's assaults on her. The panel majority holds that the University is not liable under Title IX because Bradford assaulted Brown in an off-campus house, and that the University therefore did not exercise control over the "context" in which Bradford attacked Brown.

I strongly but respectfully dissent.

## I. Factual Background

The majority provides an accurate but truncated description of the factual record.

Orlando Bradford enrolled as a freshman at the University of Arizona in the fall of 2015. He played on the football team and attended the University on an athletic scholarship. During his time at the University, Bradford physically assaulted three women: Student A, Lida DeGroote, and plaintiff Mackenzie Brown. He assaulted Student A multiple times during his freshman year, choking her repeatedly. He assaulted DeGroote over 100 times during his freshman year. He assaulted Brown somewhere between five and ten times in the summer after his freshman year and in the fall of his sophomore year.

University Title IX officials had learned of Bradford's physical assaults on Student A and DeGroote in the winter and spring of his freshman year, months before he assaulted Brown. As a result of his assaults on Student A, university officials issued a "no contact" order forbidding Bradford to contact Student A either on or off campus. But they failed to tell Bradford's football coaches of his assaults on Student A and DeGroote.

Beginning in the fall of his sophomore year, Bradford's coaches gave him permission to live off campus. On two successive nights that fall, in the off-campus house which was paid for by the University and where he was living with the permission of his coaches, Bradford dragged Brown by her hair, locked her in his room, and scratched, hit, kicked and choked her. It is undisputed that if university officials had told Bradford's coaches of his assaults on Student A and DeGroote, the coaches would not have given him permission to live off campus. Indeed, if his coaches had been informed,

Bradford would have lost his football scholarship, would been removed from the football team, and would have been expelled from the University by the end his freshman year.

## A. Student A and Lida DeGroote

Student A was a member of the softball team. She and Bradford met as high school students during an athletic recruiting trip to the University in January 2015. The University first learned about Bradford's violence against Student A in the fall of 2015, at the start of their freshman year. On September 21, 2015, four female students saw from the window of another building Bradford and Student A physically fighting in a dormitory study room. They knocked on the Resident Adviser's ("RA") door and told him what they had seen. The RA went to the other building to investigate. The RA talked with Bradford alone while Student A waited outside in the hallway. Bradford told the RA that the two of them were "just joking" and that Student A "was just mad at [him] regarding a situation that happened earlier." The RA contacted the on-call University Community Director who instructed the RA not to call the police.

An incident report was filed in "Advocate," the University's case management system. According to the report, the RA "felt like this may have started off as a very serious physical and verbal altercation between resident Bradford and resident Student A, but then may have turned into somewhat of a joke." After speaking to Bradford and Student A together, the Community Director wrote in a report that they told him that they were "just joking" and "agreed that they w[ould] not engage in this type of behavior in the future." The Community Director never talked to Student A alone.

In late 2015, Student A's parents learned of her abusive relationship with Bradford. A campus police report recounted that Student A's parents had told Student A's head softball coach about Bradford's violence against her after they had broken up in November 2015. The coach recounted in a deposition that Student A's mother had called him in January 2016 and had told him that she and Student A's father were concerned about her daughter's relationship with Bradford, and that they were relieved that they had broken up. The coach maintained in his deposition that he was unaware of any abuse and that Student A's mother did not tell him in her January call what had disturbed them about Student A's relationship with Bradford.

In January 2016, after his conversation with Student A's mother, the softball coach called Erika Barnes, the University's Title IX liaison to the Athletics Department. In her deposition, Barnes recounted that the coach informed her that "Student A and her boyfriend broke up," that it was "not a good situation," and that Student A was "really upset." Barnes told the softball coach that she wanted Student A to meet with a school psychologist. Barnes told the psychologist about the call and said that she wanted Student A to meet with her.

Neither Barnes nor the softball coach contacted anyone on the football coaching staff.

Sometime after January, Bradford and Student A began to see each other again. On March 22, 2016, Student A arrived at a study hall with a black eye and finger marks on the side of her neck. Two of her teammates went to talk to the softball coach. They told him that in the fall of 2015 Bradford had pushed Student A up against a wall, put his hands around her neck, and choked her. They told him that Student A now had a black eye and finger marks on her neck.

One of them recounted in a declaration that the coach told them that he knew about the situation with Student A and Bradford, and about the efforts to keep Student A away from him.

When Student A arrived at softball practice that day, the assistant softball coach saw the black eye and overheard conversations between the players saying that Student A's boyfriend may have been responsible. He asked Student A what happened. She replied that had been hit by a door. The assistant softball coach called Barnes later that same day.

On March 23, the next day, the head softball coach told Student A's two teammates that they should meet with Barnes and tell her everything they had told him. The two teammates met with Barnes that afternoon and told her what had happened the previous fall, including that Bradford had choked Student A. They told Barnes about Student A's black eye and the finger marks on her neck. They told Barnes that Bradford had told Student A that if she reported the abuse, he would send compromising pictures of her "to her mother, grandmother, and everyone."

The softball teammates also told Barnes that they heard that Bradford was hitting another girlfriend, Lida DeGroote, and that DeGroote often had bruises and marks all over her body. They reported hearing that in front of others Bradford had kicked and thrown DeGroote's dog into another room. They told Barnes that Bradford's roommate and best friend from high school had told them that Bradford "had a violent past," that Bradford was not afraid "to hurt someone," and that "people need to be careful." Barnes took detailed notes of her conversation with Student A's teammates.

On March 24, Barnes called Student A into her office and asked her about her black eye. Student A reported that

she was clumsy and had run into a door. That same day, Barnes accompanied Student A to another building to meet with Susan Wilson, a Title IX investigator in the Dean of Students Office, to "hear about [her] options" if she ever decided to file a complaint against Bradford. Barnes sat in on the meeting with Wilson. Barnes testified in her deposition that she told Wilson about Student A's black eye and her story that she had been hit by a door. Wilson testified in her deposition that she did not see a black eye and did not ask Student A about a black eye. Barnes and Wilson both testified that Student A told Wilson that Bradford had choked her. Wilson asked no follow-up questions about the choking.

When Barnes returned to her office after the meeting with Wilson and Student A, she photocopied her notes from her interview with Student A's two softball teammates the previous day. She sent the notes to Wilson and to Kendal Washington White, Assistant Vice President for Student Affairs and Dean of Students.

In her meeting with Barnes and Wilson, Student A had told them that Bradford might be living with a student named "Lida." Barnes and Wilson thought that Student A might have been referring to Lida DeGroote because, as Wilson stated in her deposition, "Lida's an unusual name." On several occasions during 2016, Barnes had been in contact with DeGroote and her mother about various things, including credits for an internship. Wilson knew that Chrissy Lieberman, Associate Dean of Students, was "actively meeting and working with Lida DeGroote" concerning academic matters. Wilson went to Lieberman's office and told her that a student by the name of Lida had been mentioned by another student and that DeGroote might be in a concerning relationship. Lieberman met with

DeGroote the next day, but the focus of the meeting was an academic matter. Lieberman tried indirectly to get DeGroote to talk about any other problems she might be having, but she did not ask DeGroote directly about her relationship with Bradford. DeGroote did not volunteer any information.

Neither Barnes nor Wilson, nor anyone in the Dean of Students Office, contacted anyone on the football coaching staff about the reports of Bradford's violence against Student A and DeGroote.

On Saturday night, April 9, Bradford went to Student A's dorm room. He was intoxicated. For nearly two hours, he banged on Student A's door yelling at her to let him in. Student A refused to open the door and repeatedly told Bradford to leave. Bradford finally left about 1:30 a.m. Student A's softball coach called Barnes the next morning to tell her about the incident. Barnes contacted Student A and asked if she wanted to call the police. When Student A replied that she did, Barnes called the University of Arizona Police Department. Later that day, a university police officer met in Barnes's office with Student A and Barnes. Student A told the police officer about the door-banging incident, and about Bradford's previous assaults. In the presence of Barnes, she told the officer that on at least three occasions Bradford had choked her to the point that she could not breathe. Student A asked the officer how to get a protective order from the county court.

Later that same day, Barnes called Greg Byrne, the University Athletic Director. Barnes testified in her deposition that she told Byrne only about the door-banging incident. Barnes did not tell Athletic Director Byrne about Student A's black eye, the finger marks on her neck, or the

prior choking incidents. Nor did Barnes tell Byrne about the reports that Bradford had been assaulting DeGroote.

Byrne told Barnes that he would contact the head football coach, Richard Rodriguez. Because Rodriguez was traveling that day, Byrne spoke to Bradford's position coach instead. The position coach and Athletic Director Byrne met with Bradford. They discussed the door-banging incident and gave Bradford "a lecture on underage drinking." The position coach later talked to head coach Rodriguez about the door-banging incident. The position coach testified in his deposition that Bradford received three days of what he characterized as "physical punishment" for violating the team's underage drinking rules.

On April 11, 2016, Wilson issued a no contact order to Bradford. In relevant part, the order provided: "You are prohibited from having any contact with Student A . . . This directive applies to both on and off campus contact." Bradford was reassigned to another dorm for the remainder of his freshman year. The football team's Player Rules required freshmen to live in a university dorm. DeGroote testified in her deposition that even though Bradford was supposed to have been living in Student A's dorm, in fact he had been staying at DeGroote's house on "most nights" from January to April. Instead of moving to his assigned room in the new dorm, Bradford moved into a teammate's off-campus house for the remainder of his freshman year.

On May 10, 2016, Lida DeGroote's mother spoke on the telephone with Associate Dean Lieberman about DeGroote's academic matters. During the conversation, DeGroote's mother brought up the issue of DeGroote's safety. DeGroote's mother did not mention Bradford by name. She testified in her deposition that she told Lieberman: "Now we have another issue with her safety. I

believe you saw the bruises on her when she was in there." The reference was to bruises Lieberman should have been able to observe during a meeting with DeGroote a month before. Lieberman did not respond. DeGroote's mother testified it was "just crickets," an "uncomfortable" silence.

## B. Mackenzie Brown

Bradford started dating MacKenzie Brown in February 2016 while they were both freshmen. He started to physically abuse Brown during the summer of 2016 while she was at the University for summer session. By that summer, Bradford had moved into an off-campus house that he shared with other members of the football team. Bradford needed the permission of his coaches to move to an off-campus house after his freshman year. Head football coach Rodriguez testified in his deposition that football players other than freshmen were governed by Player Rule 15. The Rule provided, "Living off-campus is subject to approval by head coach and position coach." Rodriguez testified that he could require players to move back on campus if they behaved inappropriately. He testified: "I . . . kind of hung that over them, like, 'Listen, if you are not being responsible in your appointments or whatever, then we can tell you to, you know, move back on campus.'"

Brown testified in her deposition that Bradford physically abused her between five and ten times during the course of their relationship. She testified that Bradford "would get upset about little things." On one occasion during the summer, Brown was in Phoenix visiting her father. Bradford texted Brown, but Brown did not see the text right away. Bradford did not believe her when she replied later that she had not seen the text. "He told me to leave where I was in Phoenix, even though he wasn't there. And I was like: 'No I'm not leaving. I'm in Phoenix.

You're in Tucson.'" In August 2016, Bradford gave Brown a black eye: "He was upset about something, and I wasn't saying anything back. . . . And he said: 'You don't care.' And he tried to like slap my hand off of my face, or something, or slap my face. And he hit my eye and then I had a black eye." On another occasion, while they were at a Goodyear Tire store, Brown was scrolling through her contacts on her phone. Bradford saw the name "Josh" and asked her "Oh, who is that?" Brown told Bradford that Josh was her work supervisor. "That made him upset. And then he like grabbed my arm and dug his nails into my arm. I have a scar."

Bradford sent threatening texts to Brown. After Brown refused to leave where she was in Phoenix, he texted her, "I'm going to show you what happens to people who disrespect me." On another occasion, when Brown refused to use a phone application to share her location with him, Bradford texted her, "You're going to make me break your fucking face."

Bradford's abuse escalated in the fall. On September 12, 2016, Bradford purported to believe that Brown had scratched his car. Bradford and Brown were at Bradford's off-campus house where he lived with other football players. Brown tried to go home, but Bradford would not let her. She testified in her deposition:

> [H]e like was trying to pull me in and I didn't want to go, so I was like trying to stop myself like plant my feet, and he pulled me into the house. And then [he] open[ed] the door, and then he pushed me on the floor. . . . And then he was yelling. And then he slapped me and I hit my head on the cupboard[.] . . . [A]nd then he started like dragging me by my hair

to the stairs. . . . And then like he was choking me . . . on the staircase. . . . Then he said, . . . "Say goodbye to your mom. You're never going to talk to her again." . . . [T]hen he took me upstairs . . . and he like locked the door and took off his shirt. And he said: "You're about to make me real mad." And . . . he was like hitting me up side my head and pushing me on the ground and hitting on my arms and my legs.

Bradford later took Brown to Safeway to get Tylenol. Brown asked to go home, but Bradford refused. Brown spent the night at Bradford's house. Bradford took her home the next morning.

Brown was at Bradford's house again the next day, September 13. Bradford went to Wendy's with some friends. Brown told him she did not want anything, but Bradford brought her back a "Frosty." Brown said she did not want it, so Bradford put it in the freezer. Another football player who lived in the house told Brown that it was "messed up" that she would not eat the Frosty, so Brown responded, "Okay, I'll take a bite." Bradford became angry, saying, "You listen to other people now instead of me." Brown said she was going to call an Uber and go home. Bradford refused to allow her to go upstairs to get her things. Brown went out to the sidewalk and called Uber. Bradford came outside and forced her into his car. "[T]hen he kind of like smacked me in my face and then like grabbed my hair, and then my nose started bleeding." Brown went back inside to clean up the blood. Bradford looked through Brown's phone and found Brown's brother's name with a phone number from a different area code than the rest of Brown's family's phone numbers. Bradford refused to believe it was

her brother's number. She testified: "And so then he got upset, and that's like when he started hitting me again." Bradford finally fell asleep.

Brown stayed awake most of the night, waiting until she could call her mother. After Bradford dropped Brown off at her house in the morning on his way to football practice, Brown called her mother. Her mother called the police and Athletic Director Byrne.

Brown went to her family doctor on September 16. She presented with:

> burst blood vessels in the eye, bruising on the lower part of the neck, likely concussion, intractable acute post-traumatic headache, neck pain from direct trauma (kicking and hitting) as well as from strangulation, upper back pain, left rib pain with breathing and movement, left upper abdominal pain, abdominal contusions, . . . head tenderness from hitting a cabinet and being punched in the head during the attack, scratches on her forehead, upper arm contusions, circular contusions circling the base of her neck, and contusions with tenderness over her left rib area.

Bradford was arrested on September 14. He received an interim suspension notification that same day "due to [his] behavior that has been determined to present a substantial risk to members of the university community." When DeGroote's mother learned that Bradford was in police custody, she left an anonymous tip with the Tucson Police Department that Bradford had been abusing DeGroote. Bradford was expelled from the University on October 14.

Bradford was criminally charged based on his assaults on Brown and DeGroote, and he pleaded guilty to felony aggravated assault and domestic violence. In November 2017, Bradford was sentenced to five years in prison.

## C.  Proceedings in the District Court

DeGroote and Brown each sued the University under Title IX in federal District Court for the District of Arizona. Their cases were assigned to different judges.

The district judge in DeGroote's case denied DeGroote's and the University's cross-motions for summary judgment. *DeGroote v. Ariz. Bd. of Regents*, No. CV-18-00310-PHX-SRB, 2020 WL 10357074, at \*12 (D. Ariz. Feb. 7, 2020). The judge held that DeGroote sufficiently established that the University exercised substantial control over the "context" of Bradford's abuse of DeGroote, including abuse that took place off-campus. *Id.* at \*8 ("Bradford's violence against women, regardless of geographic location, not only threatened the safety of Plaintiff and Student A, but threatened the safety of the larger University community."). The parties settled before trial.

The district judge in Brown's case granted summary judgment to the University. In the view of the judge, Brown's claim failed because none of the abuse, including the assaults on September 12 and 13, was in a "context" under the control of the University. The judge concluded:

> *Plaintiff does not allege that any of her abuse occurred on campus or in any other setting under Defendants' control.* While it is undeniable that Defendants exercised substantial control over Bradford, *Plaintiff has not offered any evidence that Defendants*

> *exercised control over the context in which her abuse occurred.*  Defendants therefore cannot be liable for Plaintiff's harassment under Title IX.

(Emphasis added.)

Brown timely appealed.

## II.  Discussion

### A.  Title IX

Subject to exceptions not relevant here, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Deliberate indifference by an educational institution to student-on-student sexual harassment supports a private suit for money damages under Title IX.

The key Supreme Court case is *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999).  The plaintiff in *Davis* had been sexually harassed by another student at school.  *Id.* at 646.  The Court held that the school could be liable for failing to respond to complaints by plaintiff and other students about the conduct of the harasser.  *Id.* at 646–47.  The Court limited a school's liability for student-on-student sexual harassment, however, to circumstances where the school "exercises substantial control over the harasser and the context in which the known harassment occurs."  *Id.* at 645.  Justice O'Connor wrote for the Court:

> The statute's plain language confines the scope of prohibited conduct *based on the recipient's degree of control over the harasser and the environment in which the harassment occurs*. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. Moreover, because the harassment must occur "under" the operations of" a funding recipient, *the harassment must take place in a context subject to the school district's control*.

*Id.* at 644–45 (alterations in original) (emphasis added) (citations omitted).

The Court in *Davis* did not define "context," but its meaning may be inferred from several passages in its opinion. First, the Court explained that where the harassment occurs "during school hours and on school grounds," the misconduct takes place "under" an "operation" of the school. *Id.* at 646. Second, the Court cited with approval a Seventh Circuit case in which the court had "[found] liability where [the] school fail[ed] to respond properly to 'student-on-student sexual harassment that takes place while the students are involved in school activities *or otherwise under the supervision of school employees*." *Id.* at 646 (quoting *Doe v. Univ. of Ill.*, 138 F.3d 653, 661 (7th Cir. 1998)) (emphasis added). Finally, the Court summarized the applicable law: "We thus conclude that

recipients of federal funding may be liable for "subject[ing]" their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and *the harasser is under the school's disciplinary authority*." *Id.* at 646–47 (emphasis added).

These passages make clear that while the physical location of the harassment can be an important indicator of the school's control over the "context" of the alleged harassment, the key consideration is whether the school has disciplinary authority over the harasser in the setting in which the harassment takes place. *See id.* at 644 ("Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference *where it lacks the authority to take remedial action*.") (emphasis added). That setting could be a school playground. But it could equally well be an off-campus field trip, an off-campus research project in a laboratory not owned by the school, or an off-campus residence for which the school pays the rent and where students reside with permission of the school. If the harassment occurs in such a setting—that is, in a "context" over which the institution has substantial control—the institution may be held liable for deliberate indifference under Title IX even though the harassment takes place off the physical property of the institution.

A number of courts have concluded that liability attaches under Title IX when harassment occurs off the physical location of the campus, so long as the educational institution has sufficient control over both the "harasser" and the "context" in which the harassment takes place.

In *Simpson v. University of Colorado Boulder*, 500 F.3d 1172, 1173 (10th Cir. 2007) (Hartz, McKay & Gorsuch, JJ.),

two female undergraduates, Lisa Simpson and Anne Gilmore, were raped in Simpson's off-campus apartment by members of the university football team and by high school students who were being recruited for the team.  The court held that the rapes took place in a "context" over which the university had control, even though they took place in Simpson's off-campus apartment.  The court wrote:

> The CU football team recruited talented high-school players each fall by bringing them to campus.  Part of the sales effort was to show recruits "a good time."  To this end, recruits were paired with female "Ambassadors," who showed them around campus, and player-hosts, who were responsible for the recruits' entertainment.  At least some of the recruits who came to Ms. Simpson's apartment had been promised an opportunity to have sex.

*Id.*

Reversing the district court's grant of summary judgment to the University, the court held that plaintiffs had presented evidence sufficient to support a jury verdict under Title IX.  *Id.* at 1185.  Viewing the evidence in the light most favorable to plaintiffs, the court held that the University had a policy of showing recruits "good time"; that the rapes of Simpson and Gilmore in Simpson's off-campus apartment were caused by the University's "failure to provide adequate supervision and guidance to player-hosts chosen to show the football recruits a 'good time'"; and that "the likelihood of such misconduct was so obvious" that the University's failure "was the result of deliberate indifference."  *Id.* at 1173.

In *Roe ex rel. Callahan v. Gustine Unified School District,* 678 F. Supp. 2d 1008, 1011 (E.D. Cal. 2009), plaintiff was a high school student who was sexually assaulted and verbally harassed by several upper-class teammates during a school district's summer football camp held off campus. The school district moved for summary judgment on his Title IX claim, arguing that it lacked substantial control over the "context" of the harassment because "none of the allegedly harassing acts took place on 'school grounds.'" *Id.* at 1016, 1025. The district court denied the motion, finding that the school district had substantial control over the context of the harassment because the football camp was (1) sponsored and promoted by the district's coaches; (2) the players were transported on district buses and supervised on the bus by district employees; and (3) the camp was governed by a district Administrative Directive that outlined supervision ratios and disciplinary procedures. *Id.* at 1025.

In *Weckhorst v. Kansas State University*, 241 F. Supp. 3d 1154 (D. Kan. 2017), *aff'd* 918 F.3d 1094 (10th Cir. 2019), plaintiff Sara Weckhorst was a student at Kansas State University ("KSU"). She alleged in her complaint that she attended an off-campus fraternity event where she became intoxicated. *Id.* at 1159. J.F., a fellow student at KSU and a designated driver for his fraternity, took plaintiff into his truck and raped her in front of about fifteen KSU students, some of whom took photographs and videos. *Id.* J.F. then drove her back to his off-campus fraternity house and assaulted her on the way. *Id.* When they arrived at the fraternity house, he took her to the fraternity's "sleep room" and raped her again. *Id.* He left her there, naked and passed out. *Id.* When she woke up, she was being raped by J.G., another KSU student and a member of the fraternity. *Id.* She left the room and went downstairs. J.G. followed her onto

the patio and raped her again. *Id.* Photographs and videos were later circulated widely on social media. *Id.* at 1159–60.

The University refused to discipline J.F. and J.G. on the ground that the rapes had taken place off campus. *Id.* at 1160–63. After the rapes and after the University's refusal to discipline J.F. and J.G, Weckhorst suffered from symptoms of post-traumatic stress disorder. *Id.* at 1163. She stopped going to classes, withdrew from her math course, and lost her scholarship. *Id.* at 1163–64. She brought suit under Title IX, alleging deliberate indifference by KSU. *Id.* at 1164.

The University moved to dismiss under Rule 12(b)(6) on the ground that it had no control over the context in which the off-campus rapes occurred. *Id.* at 1165. The district court disagreed, holding that the University had sufficient control over the context to warrant liability under Title IX. *Id.* at 1168. In support of its holding, the court cited a number of factual allegations in the complaint: (1) KSU fraternities are open only to KSU students and are described on the University's website as "Kansas State University Organizations"; (2) the director of the fraternity at issue was a university instructor; (3) the University promotes its fraternities to prospective students and parents; (4) the University has five employees specifically charged with supporting and advising fraternities and sororities; (5) the University has the authority to regulate fraternities, including promulgating rules for parties; and (6) the Dean of Students suspended the fraternity where the rapes occurred for its use of alcohol at the party when plaintiff was raped. *Id.* at 1167. In sum, the court found that while KSU may not have had "*complete* control over the alleged assailants at the fraternity house or the fraternity parties, [Weckhorst's]

allegations do reflect that KSU had *substantial* control over both the assailants and the fraternity." *Id.* at 1168 (emphases in original).

## B. University Control Over the "Context" in Which Bradford Assaulted Brown

The University does not argue that it was unaware of Bradford's assaults on Student A and DeGroote, or that it had no control over the "context" of those assaults. Rather, it argues that it had no control over the context of Bradford's assaults on Brown. Brown argues that because the University had control over the context of Bradford's known harassment of Student A and DeGroote, the University's failure to take action violates Title IX without respect to whether the University had control over Bradford's off-campus housing. That is, Brown argues that because the University had control over the context of Bradford's assaults on Student A and DeGroote, it necessarily had control over the context of Bradford's subsequent assaults on other university students including Brown, regardless of where in the community the assaults took place.

I would not go so far, and the facts of this case do not require me to do so. It is clear, on the facts of this case, that the University had control over the "context" in which Bradford assaulted Brown.

Bradford was subject to Player Rules specific to football players. The Player Rules required all freshmen team members to live in university dorms. Bradford flouted the rules during his freshman year. On most nights from January to early April 2016, he stayed at DeGroote's off-campus house. After he was assigned to a different dorm from Student A in mid-April, Bradford moved off campus entirely, into a house shared with another football player.

Had university officials or football staff members chosen to investigate, they could have enforced those Rules, requiring Bradford to live in university dorms during the entirety of his freshman year.

More important, and directly relevant to Brown's claim under Title IX, after he finished his freshman year, Bradford moved into another off-campus house with other members of the football team. The University paid for that off-campus housing and allowed Bradford to live off campus only with the permission of his coaches and on condition of good behavior. Head coach Rodriguez specifically testified in his deposition that Player Rule 15 required permission to live off campus and that permission was conditioned on good behavior. Rodriguez testified in his deposition that the football team had a zero-tolerance policy for violence against women. He testified that a player's violence against women would lead to immediate dismissal from the team. Rodriguez testified that the "first time" he heard about Bradford "doing anything physically violent to his girlfriend" was the day he kicked him off of the team. Rodriguez said that if he had known earlier, he "certainly would have kicked him off earlier." Had University Title IX officials informed Rodriguez of Bradford's assaults on Student A and DeGroote during his freshman year, Bradford would never have been permitted to live off campus, and his September 12 and 13 assaults on Brown at his off-campus house would never have occurred.

Brown submitted an expert report to the district court. The expert concluded that in failing to inform head coach Rodriguez of the assaults on Student A and DeGroote, the University failed to fulfill its responsibilities under Title IX. Among other things, the expert wrote that the University had

virtually complete control over Bradford, including control over where he lived:

> Student-athletes, especially those at large Division I "Power 5" conference schools, are very much under the control of the University. They are told where they can live, where and when they will be places— including practices, games, housing, meals, and study time. They are given clear expectations for behavior when not in school or at practice, and they are certainly under the financial control of the University and the Athletics department. Having worked with and trained thousands of coaches and athletes at all levels from high school to college to Olympians, I can state unequivocally that any belief that UA [the University of Arizona] has no control over Bradford is misplaced and uninformed.

University administrators knew about the September 2015 fight between Bradford and Student A in the dorm study room; knew that Bradford had been abusing Student A, including choking her three times; knew that Student A had a black eye and finger marks on her neck in March 2016; knew that Student A wanted a court-issued protective order against Bradford in April 2016; knew that the University had issued a no-contact order to Bradford; and knew about reports that Bradford lived with and frequently hit DeGroote. They never told Athletic Director Byrne or head coach Rodriguez any of this.

The district judge ruled against Brown on the ground that she failed to "allege that any of her abuse occurred on

campus or in any other setting under Defendant's control," and that Brown had not "offered any evidence that Defendants exercised control over the context in which her abuse occurred." The district judge was mistaken.

Brown both alleged and introduced evidence that the University had substantial control over the "context" in which Bradford assaulted her on September 12 and 13. She introduced Player Rule 15, which allowed Bradford to live off campus only with permission of his coaches; she introduced evidence that Bradford had a football scholarship that paid his living expenses; she introduced Rodriguez's testimony that Bradford's permission to live off campus was conditioned on good behavior; she introduced Rodriguez's testimony that if he had known of his assaults on Student A and DeGroote he would have thrown Bradford off the team, with the result that he would have lost his scholarship and been expelled from the University; and she introduced expert evidence, consistent with Rodriguez's testimony, that the University had extensive control over Bradford, including control over where he could live. In her response to the University's motion for summary judgment, Brown specifically pointed out to the district judge the University's control over where Bradford lived. She wrote, "Coach Rodriguez permitted his players to reside off-campus only on good behavior, 'subject to moving back on campus' if more supervision was required but, as discussed above, he was kept out of the loop." Pl.'s Resp. to State Def's Mot. for Summ. J., at 8.

Brown thus produced extensive evidence that Bradford's violent assaults on September 12 and 13 were in a "context" over which the University exercised substantial control. The University not only "exercise[d] significant control over the

harasser," but also over the "context" in which the harassment took place. *Davis*, 526 U.S. at 645, 646.

## Conclusion

Brown seeks "to hold the [University] liable for its own decision to remain idle in the face of known student-on-student harassment in its school[]." *Davis*, 526 U.S. at 641 (emphasis omitted). Because the University had significant control not only over Bradford, but also over the "context" in which he assaulted Brown, I would reverse the decision of the district court.

I strongly but respectfully dissent.